1
2
3
4
5
6
7
8           UNITED STATES DISTRICT COURT
9        FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   DANAE SCHMITZER,                     Case No.  1:22-cv-01038-JLT-BAM

12               Plaintiff,               **FINDINGS AND RECOMMENDATIONS
                                          REGARDING PLAINTIFF'S MOTION FOR
13        v.                              SUMMARY JUDGMENT**

14   MARTIN O'MALLEY, Commissioner of     (Docs. 17, 19.)
     Social Security,[1]
15
16               Defendant.
17
18

19                          __INTRODUCTION__

20        Plaintiff Danae Schmitzer ("Plaintiff") seeks judicial review of a final decision of the

21   Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance

22   under Title II of the Social Security Act.  The parties' briefing on the motion was submitted, without

23   oral argument, to Magistrate Judge Barbara A. McAuliffe for findings and recommendations.  (Docs.

24   17, 19.)

25
26
27   [1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.
     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted
28   for Kilolo Kijakazi as Defendant in this suit.

                                    1

Having considered the parties' briefs, along with the entire record in this case, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence in the record and is based upon proper legal standards. Accordingly, this Court will recommend affirming the agency's determination to deny benefits.

## FACTS AND PRIOR PROCEEDINGS

Plaintiff applied for Title II Disability Insurance on October 3, 2018, alleging that she became disabled on May 23, 2017. AR 301-309.[2]  Plaintiff's application was denied initially on January 17, 2019, and on reconsideration on April 5, 2019. AR 127-131, 135-140. Plaintiff requested a hearing before an administrative law judge ("ALJ") and ALJ Lynn Ginsberg held a hearing on May 14, 2021. AR 69-101. ALJ Ginsberg issued an order denying benefits on the basis that Plaintiff was not disabled on August 16, 2021. AR 13-41. Plaintiff sought review of the ALJ's decision, which the Appeals Council denied. AR 1-7. This appeal followed.

**May 14, 2021 Hearing Testimony**

ALJ Lynn Ginsberg held a telephonic hearing on May 14, 2021. AR 69-101. Plaintiff appeared and was represented by her attorney, Jonathan Pena. Daniel Best, an impartial vocational expert, also appeared and testified. AR 93-100. The ALJ began by admitting Exhibits 1A through 4A, 1B through 19B, 1D through 8D, 1E through 16E, and 1F through 77F into evidence. AR 74.

Upon examination by the ALJ, Plaintiff testified that her Workers' Comp case was pending and that it was in the discovery or information-gathering stage. AR 74-75. For that case, Plaintiff stated that she was not aware of needing to see another doctor for evaluation. Plaintiff testified that she was not receiving benefits from her former employer and had not received them at any point after her exposure. AR 75. Plaintiff stated that her former employer had not settled or paid for doctor bills or testing in relation to her exposure and injury. *Id.* Plaintiff testified that she would need ongoing treatment, which she would need due to "a lot of different medical problems." AR 76. Plaintiff

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

testified that she was at that time not seeing a therapist or psychiatrist as she could not afford anything despite Dr. Johnson making a recommendation.  *Id.*

Plaintiff testified that she lived by herself with no pets.  *Id.*  She stated that she would rest when her fatigue is flared up, would take a shower, would get dressed when she felt well, and would run errands to the grocery store.  AR 76-77.  Plaintiff further testified that she walks and would meet up with friends for lunch or a walk when she felt up to it.  AR 77.  Plaintiff stated that the amount she could walk varied from day to day, but she could at least walk around the block.  *Id.*  She said that during COVID she did not meet with friends, but she otherwise met with friends at least once a month.  *Id.*  Plaintiff stated that she would go to the store approximately every two weeks and would walk around the block approximately two or three times per week.  *Id.*

Plaintiff testified that CIRS caused debilitating fatigue that prevented her from working.  AR 78.  She stated that there were many triggers for inflammation and also noted that sleeping was difficult as she has a 100% blockage in the right side of her nose.  *Id.*  Plaintiff testified that Dr. Jim Lysander diagnosed her with CIRS.  *Id.*

Plaintiff's attorney added that the diagnosis was in the record as part of Exhibit 64F and 65F.  AR 78-79.  Plaintiff's attorney further noted that the CIRS diagnosis was conclusive and the chronic fatigue syndrome diagnosis was ongoing.  AR 79-80.  Plaintiff's attorney further stated that Dr. Lysander's report was obtained in relation to Plaintiff's Workers' Compensation case.  AR 80.  Plaintiff's attorney noted that Plaintiff provided a function-by-function Medical Source Statement of Plaintiff's impairments by Dr. Lysander in Social Security vocational terms as part of Exhibit 64F.  AR 81.  Plaintiff's counsel further stated that counsel did not pay the provider for opinions, but Plaintiff's insurance or Plaintiff paid for the medical opinion.  *Id.*

In response to questions from her attorney, Plaintiff testified that her fatigue caused her the most difficulty in returning to a full-time job.  AR 82.  Plaintiff testified that when she felt fatigued, she had aches and pains and felt the sudden need to rest and lie down.  Plaintiff testified that in 2017 she felt fatigued five days per week, on average.  AR 82-83.  Plaintiff stated that the fatigue would last different amounts of time, from a short while to a full day, and she had "more bad days than good days."  AR 83.  Plaintiff testified that she usually experienced the worst pain in her hands and legs, but

also had chronic inflammation all over her body.  *Id.*  Plaintiff stated that the pain could be sharp or dull, and the inflammation was worst in her arms and legs.  AR 83-84.  She testified that she has swelling in her lower legs, has "weird skin things" on her legs, and sometimes would have a skin rash on her face and neck.  AR 84-85.  Plaintiff said that the swelling occurred "all the time" in her lower legs, ankles, and feet, and the swelling worsened when she stood or sat a lot.  AR 85.  Plaintiff would treat the swelling by elevating her legs above her heart, and her doctor recommended she get some compression stockings.  AR 85-86.  Plaintiff testified that she had flareups and tingling in her hands throughout the day.  AR 86-87.  She said that she could do manipulative activities like folding clothes or holding the phone and move her hands around when they became numb.  AR 87.

Plaintiff testified that in an average day she could lift and carry approximately 15 or 20 pounds.  AR 87-88.  Plaintiff also testified that she had shortness of breath due to restrictive lung disease and her breathing has gotten worse.  AR 88.  She testified that her doctors recommended activities to improve her lungs.  *Id.*  Plaintiff said that any kind of exertion, including yoga, walking around the block, or walking to do grocery shopping, gave her shortness of breath.  AR 88-89.  Plaintiff stated that she did not use inhalers or nebulizers to help with shortness of breath.  *Id.*  Plaintiff stated that she worked up to doing some recommended yoga and breathing classes to help with her shortness of breath.  AR 89-90.  She further testified that she was now "super sensitive" to environmental irritants, which affected her breathing.  AR 90.

Plaintiff testified that in an average day, she would need to lie down and rest for at least two to three hours.  AR 91.  Plaintiff testified that her impairment "bad days" last for at least half of a given month.  AR 91-92.  Plaintiff testified that she was able to do daily activities including bathe on her own, put on her own clothes, and feed herself.  AR 92.  Plaintiff testified that she could concentrate for approximately 45 minutes before needing a mental break.  *Id.*  Plaintiff also stated that she was still having issues with brain fog and memory issues and said that those issues led her to repeat things and find items where they did not belong.  *Id.*

Following Plaintiff's testimony, the ALJ elicited testimony from vocational expert ("VE") Daniel Best.  AR 93-100.  The VE testified that his resume on record correctly stated his qualifications, that he had not had prior personal or professional interactions with Plaintiff, that he

4

understood that he was to be an impartial witness, that he had not had discussions regarding the merits of the case, and that he was familiar with the Social Security Administration's definitions of the exertional requirements of work and skill levels contained in the Dictionary of Occupational Titles. AR 93-94.  The VE further testified that he was aware that he should inform the ALJ if his opinion conflicted with the information in the Dictionary of Occupational Titles and that he had reviewed the records available to him prior to the hearing.  AR 94.  Plaintiff's counsel stated that he had no objections to the VE serving as vocational expert in the matter.  *Id.*  The VE classified Plaintiff's past work as Store Manager (DOT No. 185.167-046, light work, skilled, SVP 7); Advertising Manager (DOT No. 163.167-010, sedentary work, skilled, SVP 8); and Administrative Officer (DOT No. 169.167-010, sedentary work, skilled, SVP 7).  AR 94-95.

The ALJ then asked the VE hypothetical questions.  For the first hypothetical, the ALJ asked the VE to consider a hypothetical person who could lift and carry up to 20 pounds occasionally and 10 pounds frequently; could stand and walk for about six hours; could sit for about six hours in an eight-hour workday with normal breaks; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could have occasional exposure to temperature extremes or hot and cold; could have occasional exposure to wetness and humidity; could have occasional exposure to excessive noise, could have occasional exposure to excessive vibration; could have occasional exposure to environmental irritants, such as fumes, odors, dusts, and gases; could have no exposure to poorly ventilated areas; could have no exposure to chemicals; could have no exposure to unprotected heights; could have no use of moving hazardous machinery; could understand and remember instructions that could be learned after a brief demonstration or up to 30 days of on-the-job training; could keep sufficient pace to complete tasks and meet quotas typically found in unskilled work; could have only superficial face-to-face interaction with the public but no limits on phone interaction; could adapt to frequent changes in the workplace.  AR 95-96.  The VE responded that none of Plaintiff's past work would be available, but other jobs examples would match the hypothetical individual's limitations, including:  Small Products Assembler II (DOT No. 739.687-030, light, SVP 2, 19,000 jobs nationally); Bench Assembler (DOT No. 706.684-042, light, SVP 2, 27,000 jobs nationally); and Packer/Inspector (DOT No. 784.687-042, light, SVP 2, 21,500 jobs nationally).  AR 96.

For the second hypothetical, the ALJ added that the hypothetical individual would only be able to stand and walk for approximately four hours in an eight-hour workday and could only perform bilateral handling, fingering, and feeling frequently.  AR 97.  The VE testified that there would leave the Assembler (DOT No. 706.684-042, light, SVP 2, 27,000 jobs nationally) with a reduction in job numbers of approximately 50 percent.  *Id.*  The VE further testified that this limitation would not allow the Small Products Assembler II or Packer/Inspector jobs, but would permit for Electronics Worker (DOT No. 726.687-010, light work, SVP 2, 28,000 jobs nationally) which would not have an erosion of job numbers and Inspector/Hand Packager (DOT No. 559.687-074, light work, SVP 2, 65,000 jobs nationally) which would have a 50 percent reduction in job numbers given the standing and walking limitations.  *Id.*

For the third hypothetical, the ALJ added that the individual would be off task twenty percent of the time due to impairments.  AR 98.  The VE testified that this would not allow performance of jobs to competitive work standards.  *Id.*  The VE testified that, based upon his experience, a worker being off for ten to fifteen percent of a work shift on a daily, ongoing basis would preclude competitive work.  *Id.*

For the following hypothetical, the ALJ added that the hypothetical individual would have to be absent or late three times a month or so.  *Id.*  The VE testified that this would exceed the allowable number of sick and vacation days and would therefore not allow for the performance of competitive work.  *Id.*

Under examination from Plaintiff's attorney, Plaintiff's attorney asked whether the hypothetical individual from the first hypothetical could perform any work if the individual also would need to elevate their lower extremities above waist level for three hours in an average day.  AR 99.  The VE testified that this would preclude work as that would not be allowable in a competitive work environment.  *Id.*

Plaintiff's attorney then added to the first hypothetical that the individual would have to take five unscheduled breaks a day that would last for 15 minutes each.  *Id.*  The VE testified that the hypothetical individual could not perform any work as that would not be tolerated in a competitive work situation.  *Id.*

Plaintiff's attorney then asked whether jobs would remain for a hypothetical person who could lift and carry twenty pounds occasionally; could lift and carry ten pounds frequently; could stand and walk for four hours; would be limited to occasional stooping, crouching, and crawling; could not climb ladders or ropes; must avoid all dusts, fumes, mold, poor ventilated areas, extreme heat, extreme cold; and would be limited to occasional handling, fingering, and feeling.  AR 99-100.  The VE testified that such an individual could not perform any of the previous light jobs identified, and there would be no other work given the combination of no face-to-face customer service, limitations in sitting, and upper extremity limitations.  AR 100.

**Medical Record**

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  AR 13-41.  Specifically, the ALJ found that Plaintiff had not engaged in substantial gainful activity from since the alleged onset date of May 23, 2017.  AR 18.  The ALJ identified the following severe impairments: adjustment disorder, anxiety disorder, chronic fatigue, chronic inflammatory response syndrome (CIRS), and a cardiac impairment.  AR 18-19.  The ALJ also identified the non-severe impairment of breast cysts. *Id.*  The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments.  AR 19-21.

Based on a review of the entire record, the ALJ found that Plaintiff retained the RFC to perform light work with the limitations that Plaintiff was limited to: lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk for about six hours and sit for about six hours in an eight hour workday with normal breaks; never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs; have occasional exposure to extreme temperatures of hot and cold; occasional exposure to wetness or humidity; occasional exposure to excessive noise and excessive vibration; occasional exposure to environmental irritants such as fumes, odors, dust, and gases; no exposure to poorly ventilated areas; no exposure to chemicals; no exposure to unprotected heights and

7

no use of moving hazardous machinery; understand and remember instructions that can be learned after a brief demonstration or up to thirty days of on-the-job training; can keep pace sufficient to complete tasks and meet quotas typically found in unskilled work; superficial face-to-face interactions with the public, but no limits on phone interaction; and can adapt to frequent changes in the workplace. AR 22-29. The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "medical opinion(s) and prior administrative medical finding(s)." AR 22; 22-29.

Given this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work. AR 29. However, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. AR 30-31. The ALJ noted that examples of jobs consistent with Plaintiff's RFC included: (1) Small Products Assembler, (DOT No. 739.687-030, light, SVP 2, 19,000 jobs nationally); (2) Bench Assembler (DOT No. 706.684-042, light, SVP 2, 27,000 jobs nationally); (3) Packer Inspector, (DOT No. 784.687-042, light, SVP 2, 21,500 jobs nationally). AR 30. The ALJ also found that the VE's testimony was consistent with the Dictionary of Occupational Titles. AR 31. The ALJ therefore concluded that Plaintiff had not been disabled from May 23, 2017, through the date of the decision. *Id.*

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's

determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

## DISCUSSION[3]

Plaintiff contends that the ALJ erred in her step two analysis and failed to consider the effects of Plaintiff's Mast Cell Activation Syndrome ("MCAS") as part of the RFC. (Doc. 17 at 15-18.)  Plaintiff further contends that the ALJ's RFC assessment was unsupported by anything other than the ALJ's lay interpretation of the evidence. (*Id.* at 18-20.)  Plaintiff also contends that the ALJ improperly rejected the opinions of Plaintiff's physicians Dr. Pietruszka and Dr. Jim. (*Id.* at 20-23.)

### A.   Step Two Impairments

Plaintiff argues that the ALJ erred by failing to consider the effects of Plaintiff's Mast Cell Activation Syndrome at step two or as part of the RFC. (Doc. 17 at 15-18.)

At step two of the five-step sequential evaluation, the ALJ is required to determine whether a plaintiff has a "severe" medical impairment or combination of impairments. 20 C.F.R. § 404.1520(c). An impairment, or combination of impairments, can be found to be non-severe if the evidence

---

[3] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  *See* SSR 85–28, 1985 WL 56856 (Jan. 1, 1985); *see also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir.1988) (adopting SSR 85–28).  "The mere existence of an impairment is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir.1993).  A claimant bears the burden of proving that an impairment is disabling.  *Id.* (citation omitted).

"Step two is merely a threshold determination meant to screen out weak claims." *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017), citing *Bowen v. Yuckert*, 482 U.S. 137, 146–47 (1987). "It is not meant to identify the impairments that should be taken into account when determining the RFC . . . . The RFC . . . *should* be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Id.* (emphasis in original).  Any error in failing to include an impairment at step two is harmless if the ALJ considered any limitations imposed by the impairment at step four. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("The decision reflects that the ALJ considered any limitations posed by the bursitis at Step 4. As such, any error that the ALJ made in failing to include the bursitis at Step 2 was harmless.").

At step two, the ALJ found Plaintiff had severe impairments of adjustment disorder, anxiety disorder, chronic fatigue, chronic inflammatory response syndrome (CIRS), and a cardiac impairment, and noted that the "above medically determinable impairments significantly limit the ability to perform basic work activities."  AR 18-19.  The ALJ further found that Plaintiff had the non-severe impairment of breast cysts, which "would have no more than a minimal effect on an individual's ability to work."  AR 19.  The ALJ did not address MCAS.  *See* AR 18-19.

Plaintiff argues that the ALJ ignored the MCAS assessment from Dr. Jim's medical records and fatigue symptoms resulting from Plaintiff's MCAS.  (Doc. 17 at 16-17.)  As part of this argument, Plaintiff contends that the main symptom of MCAS is fatigue, and notes that fatigue was commonly reported to Plaintiff's various physicians both before and after the diagnosis.  (*Id.*)  Defendant responds that the record evidence of MCAS is limited and the ALJ considered the key MCAS symptom of fatigue as part of the RFC assessment.  (Doc. 19 at 10-11.)

Here, even though the ALJ does not reference MCAS at step two, the ALJ assesses and incorporates the resulting fatigue limitation in determining the RFC.  AR 23-24 (reducing exertional

10

1    levels, including climbing limitations, including limitations related to exposure to heights and

2    hazardous machinery, and including limitation on interactions with the public in RFC due to fatigue).

3    The RFC addressed Plaintiff's fatigue and the resulting RFC was the same regardless of the ALJ

4    labeling MCAS "severe."  Accordingly, the ALJ did not err in her step two analysis.  *See Buck*, 869

5    F.3d at 1048 ("The RFC . . . *should* be exactly the same regardless of whether certain impairments are

6    considered 'severe' or not.").

7         Furthermore, even if the ALJ erred by failing to include MCAS at step two, any error is

8    harmless because the ALJ considered the limitations imposed by MCAS at step four.  *See Lewis*, 498

9    F. 3d at 911.  Plaintiff suggests that fatigue was the primary limitation resulting from MCAS, as

10   reflected in Plaintiff's medical record.  (Doc. 17 at 16-17.)  The ALJ, however, considered and

11   accounted for fatigue at step four in assessing medical opinions and formulating the RFC.  AR 22 ("At

12   the hearing, the claimant testified that she is unable to work due to feeling fatigued and having no

13   energy"); 23 (Plaintiff "also experiences chronic fatigue"); 23-24 (reducing exertional levels,

14   including climbing limitations, including limitations related to exposure to heights and hazardous

15   machinery, and including limitation on interactions with the public in RFC due to fatigue); 24-28

16   (noting Plaintiff's chronic fatigue in assessing medical opinions).  Because the ALJ considered

17   Plaintiff's fatigue limitation at step four, any error resulting from the non-inclusion of MCAS at step

18   two is harmless.

19        Accordingly, the Court finds that the ALJ did not make a reversible error at step two of her

20   analysis.

21   **B.  Residual Functional Capacity**

22        Plaintiff next argues that the ALJ's RFC assessment was unsupported by anything other than

23   her own lay interpretation of the evidence.  (*Id.* at 18-20.)

24        An RFC "is the most [one] can still do despite [his or her] limitations" and it is "based on all

25   the relevant evidence in [one's] case record," rather than a single medical opinion or piece of

26   evidence.  20 C.F.R. § 404.1545(a)(1).  Indeed, "an ALJ's RFC determination need not precisely

27   reflect any particular medical provider's assessment."  *Pinto v. Kijakazi*, No. 1:21-cv-00585-SKO,

28   2022 WL 17324913, at *9 (E.D. Cal. Nov. 29, 2022) (citing *Turner v. Comm'r Soc. Sec. Admin.*, 613

1   F.3d 1217, 1222-23 (9th Cir. 2010)); see also *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012)

2   (finding RFC determination need not directly correspond to a specific medical opinion).  The Ninth

3   Circuit has also made clear that "it is the responsibility of the ALJ, not the claimant's physician, to

4   determine residual functional capacity."  *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).

5         Plaintiff argues that because the ALJ found state agency and physicians' assessments

6   unpersuasive as to there being severe physical impairments, disagreed with Plaintiff's treating

7   physicians' assessments, and disagreed with Plaintiff's own assessment that she could not perform any

8   work, the ALJ was left with an evidentiary deficit that she was not permitted to fill with her own lay

9   opinion.  (Doc. 17 at 19.)  However, that misstates the ALJ's actions in assessing the medical opinions

10  and Plaintiff's RFC.  In formulating the RFC, the ALJ found that state agency consultants E. Wong

11  and W. Jackson's opinions were "not found to be fully persuasive."  AR 24-25.  The ALJ also found

12  the opinions of state agency consultants J. Collado and Richard Willens and consultative examiner

13  Mickey Sachdeva to not be "fully persuasive."  AR 25.  The ALJ further found the opinions of

14  physicians Marvin Pietruszka and Lysander Jim to not be "fully persuasive."  AR 25-26, 27-28.  The

15  ALJ found the opinion of physician Nachman Brautbar to be "partially persuasive."  AR 26-27.  The

16  ALJ stated that the opinions of Scott T. Anderson and Gary Hatcher were "not found to be

17  persuasive."  AR 27.  The ALJ also found the opinions of state agency medical consultants Aileen H.

18  McAlister and Jeffery Merrill to not be "fully persuasive."  AR 28-29.  The ALJ assessed each of these

19  opinions based upon their consistency with the overall record and their supportability from the

20  examiners' own findings and notes, and only fully discounted the opinions of Scott T. Anderson and

21  Gary Hatcher as not persuasive.  *See* AR 24-29; 20 C.F.R. § 404.1520c(c)(1)-(5) (The Commissioner

22  evaluates the persuasiveness of the medical opinions based on the following factors: (1) supportability;

23  (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as

24  "evidence showing a medical source has familiarity with the other evidence in the claim or an

25  understanding of our disability program's policies and evidentiary requirements."); 20 C.F.R. §

26  404.1520c(b)(2) ("Supportability and consistency are the most important factors.").

27        Rather than improperly substituting her own opinion, the ALJ considered the opinions of the

28  state agency consultants, other physicians, Plaintiff's allegations regarding her impairments, and

1    Plaintiff's treatment records.  The ALJ incorporated physicians' findings, Plaintiff's statements

2    regarding her symptoms, and other medical evidence in determining the RFC.  *See* AR 23-24

3    (discussing physician findings, Plaintiff's statements, and other medical evidence in relation to

4    Plaintiff's CIRS, cough and shortness of breath, fear, stress, brain fog, fatigue, musculoskeletal status,

5    and daily activities); 29 (discussing Plaintiff's capacity in relation to provider findings and other

6    medical evidence).

7         Accordingly, the Court finds that the ALJ did not err in her assessment of the RFC.

8    **C.  Medical Opinion Evidence**

9         Plaintiff next contends that the ALJ erred by rejecting the opinion evidence of Dr. Marvin

10   Pietruszka and Dr. Lysander Jim without setting forth specific, legitimate reasons for doing so.  (Doc.

11   17 at 21-23.)

12        Because Plaintiff applied for benefits after March 27, 2017, her claim is governed by the

13   agency's new regulations concerning how an ALJ must evaluate medical opinions.  20 C.F.R. §

14   404.1520c.   Under the new regulations, the Commissioner does "not defer or give any specific

15   evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative

16   medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

17        The Commissioner evaluates the persuasiveness of the medical opinions based on the

18   following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4)

19   specialization; and (5) other factors, such as "evidence showing a medical source has familiarity with

20   the other evidence in the claim or an understanding of our disability program's policies and

21   evidentiary requirements." 20 C.F.R. § 404.1520c(c)(1)-(5).  Supportability and consistency are the

22   most important factors.  20 C.F.R. § 404.1520c(b)(2).

23        Ninth Circuit case law preceding the new regulations afforded deference to the medical

24   opinions of treating and examining physicians.  Indeed, prior to the current regulations, the Ninth

25   Circuit required ALJs to provide clear and convincing or specific and legitimate reasons for rejecting

26   the medical opinions of treating or examining physicians.  Contrary to Plaintiff's suggestion, these

27   standards of articulation no longer apply in light of the new regulations, and the ALJ was not required

28   to provide "specific and legitimate reasons" to discount the medical opinions. *See Woods v. Kijakazi*,

32 F.4th 785, 792 (9th Cir. 2022) (finding revised social security regulations "clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant").  However, the Ninth Circuit has clarified that "under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."  *Id.*  "The agency must 'articulate ... how persuasive' it finds 'all of the medical opinions' from each doctor or other source, . . . and 'explain how [it] considered the supportability and consistency factors' in reaching these findings."  *Id.*  (internal citations omitted); *see* 20 C.F.R. § 404.1520c(c).  In this context,

> Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant ... objective medical evidence. Id. § 404.1520c(c)(1). Consistency means the extent to which a medical opinion is "consistent ... with the evidence from other medical sources and nonmedical sources in the claim. Id. § 404.1520c(c)(2).

*Id*. at 791-92.

> 1. Opinions of Dr. Pietruszka

Dr. Marvin Pietruszka issued three sets of opined limitations.  First, on August 23, 2016, Dr. Pietruszka completed a Permanent and Stationary Report.  AR 2711-2723.  In the report, Dr. Pietruszka included work restrictions: "The patient is precluded from working in an environment in which she would be re-exposed to mold. Such exposure would exacerbate her multiple mold-related symptomatology."  AR 2720.  Dr. Pietruszka discussed Plaintiff's job description; history of injury related to her cough, dizzy-spells, irritation of the eyes, blurry vision, pounding heart, and shortness of breath; prior treatment; previous work; occupational exposure; past medical history; social history; family history; review of systems including Plaintiff's reported symptoms of headaches, eye and vision issues, cough and throat pain, depression, difficulty concentrating, difficulty sleeping, and forgetfulness, abnormal hair loss and a dermatological condition; and current medication.  AR 2712-2715.  Dr. Pietruszka's physical examination noted normal skin findings, normal head findings, normal EENT findings with "mild injection of the sclera of both eyes," normal thorax findings, normal abdomen findings, normal musculoskeletal findings, normal neurological findings, radiological findings from September 2014 showing a "mild increase in -bronchial markings bilaterally," "mild opacification .the left maxillary sinus," "marked narrowing of the nasal passages," and "bilateral

14

turbinate hypertrophy;" and normal laboratory findings with elevated total cholesterol and HDL.  AR 2715–17.  Dr. Pietruszka listed Plaintiff's subjective complaints, as well as objective findings which included: abnormal chest x-ray, abnormal sinus x-ray, normal cardiac findings except for an elevated velocity index, negative CT scan of bilateral sinuses, and results of an allergy panel.  AR 2717-18.  Dr. Pietruszka's diagnoses included: history of exposure to indoor mold; bronchitis secondary to mold exposure; sinusitis, mild, secondary to mold exposure; cephalgia, secondary to mold exposure; conjunctivitis, secondary to mold exposure; palpitations; chronic fatigue syndrome, secondary to mold exposure; depressive disorder, possibly secondary to mold exposure; anxiety disorder.  AR 2718.  Dr. Pietruszka further noted: "The patient is declared permanent and stationary as of today, August 23, 2016, on an occupational medicine basis."  *Id.*  He further included a causation analysis and brief treatment plan to continue with her current medications and be reevaluated in one month.  AR 2719-20. Dr. Pietruszka further included his assessments related to impairment ratings, apportionment, future medical care, vocational rehabilitation, and fee disclosure.  AR 2720-21.

Second, on November 1, 2018, Dr. Pietruszka also completed a Supplemental Report in which he opined that Plaintiff "was declared permanent and stationary since August 23, 2016.  She is to remain on temporary and total disability for a period of three months."  AR 759; AR 754-760 (November 1, 2018 Supplemental Report).

Third, on February 19, 2020, Dr. Pietruszka completed a Physical Residual Function Capacity Medical Source Statement in which he included the diagnoses: "Exposure to indoor mold (industrial), chronic bronchitis, chronic sinusitis, cephalgia, conjunctivitis, palpitations, chronic fatigue, depression, anxiety" and included a prognosis of "still symptomatic and not improving."  AR 776.  He further listed Plaintiff's symptoms as "NECFS, joint pain, heart palpitations, foggy brain, skin rash, blurry vision, blood shot eyes, night sweats and chills, hair loss, stomach pain" and described Plaintiff's pain as "joint pain, elbows, knees, ankles, hip, hands and wrist, back pain, joint stiffness…" *Id.*  He checked that Plaintiff's impairments, symptoms, and limitations have lasted since the date that Plaintiff claimed she could no longer work.  *Id.*  He further checked that Plaintiff could lift 20 pounds or more occasionally.  AR 776-777.  Dr. Pietruszka noted that Plaintiff could not walk one city block or more without rest or severe pain, could not walk one block or more on rough or uneven ground,

1  could not climb steps without the use of a handrail at a reasonable pace, had problems with balance

2  when ambulating, had problems with stooping, crouching, and bending, and must lie down or recline

3  for one to two hours before sitting up, standing up, or walking around.  AR 777.  He checked fatigue

4  and pain as reasons why Plaintiff needed to lie down and/or recline during the day and checked that

5  Plaintiff would need to lie down and/or recline approximately two to three hours during an eight-hour

6  workday.  *Id.*  He also checked that Plaintiff could sit approximately two to three hours and stand and

7  walk approximately two to four hours in an eight-hour workday.  *Id.*  Dr. Pietruszka also noted that

8  Plaintiff would need to take an unscheduled break every two to three hours depending on the day,

9  would have to rest two to four hours before returning to work, and would need to lie down or sit

10  quietly during the breaks.  AR 777-78.  He checked that Plaintiff did not need to elevate her legs

11  during prolonged sitting, would not need a cane or other assistive device while walking, could do

12  hand, finger, and arm manipulations "100%" of the time during an eight-hour workday, could not push

13  and pull arm or leg controls from a sitting position for six or more hours per eight-hour workday,

14  could climb stairs and ramps, could not climb ladders or scaffolds or ropes.  AR 778.  Dr. Pietruszka

15  also noted that Plaintiff suffered from depression and anxiety "due to mycotoxin exposure," would

16  have pain occasionally or frequently interfere with her attention and concentration needed to perform

17  simple work tasks, would frequently have stress severe enough to interfere with her attention and

18  concentration needed to perform simple work tasks, and suffered from: limited vision; memory lapses;

19  need to avoid temperature extremes, dust, and fumes; chronic fatigue; chemical sensitivity; foggy

20  brain; difficulty concentrating; blurry vision.  AR 778-79.  He marked that Plaintiff would be "off

21  task" more than 30 percent of the time, would likely be absent from work five days or more per

22  month, would likely be unable to complete an eight-hour workday for five days or more per month,

23  and would be 50% or less efficient than an average worker in performing an eight hour per day, five

24  day per week job on a sustained basis.  Dr. Pietruszka checked that Plaintiff would be unable to obtain

25  and retain work in a competitive work environment eight hours per day, five days per week for a

26  continuous period of six months or more because Plaintiff "continues to be symptomatic after

27  mycotoxin exposure. Health is getting worse and she has good days and bad days but more bad days

28  than good days."  AR 779.  He checked that Plaintiff could manage benefit payments and checked that

1  he based his opinion upon the history and medical file; progress and office notes; physical

2  examinations; laboratory tests and other tests; x-rays; CT scans; consultative medical opinions; and

3  psychological evaluations.  *Id.*

4       In evaluating Dr. Pietruszka's opinions, the ALJ summarized Dr. Pietruszka's findings and

5  reasoned as follows:

> Marvin Pietruszka, M.D., opined that the claimant could occasionally lift
> up to twenty pounds; must lie down for one to two hours at a time for up
> to three hours in an eight-hour day; sit for two to three hours; requires
> unscheduled breaks; would be absent for five days or more per month;
> and would be unable to complete an eight-hour workday five or more days
> per month (9F). Marvin Pietruszka, M.D., opined that the claimant was
> precluded from working in an environment in which she would be re-
> exposed to mold (94F/10). Dr. Pietruszka also noted that the claimant was
> disabled (8F/33). These opinions are not found to be fully persuasive.
> While the record contains voluminous treatment notes, the extent of the
> limitations is not fully consistent with the overall evidence and reported
> activities. The claimant's symptoms showed improvement with treatment
> of her CIRS (65F/13). Her attention span was within normal limits (4F/6,
> 23F/60). The claimant's working memory, recall memory, and executive
> functioning were within normal limits (23F/60). She was able to perform
> digit-span testing forwards and backwards (64F/38, 68F/27). Her thought
> process was linear (4F/6). The claimant was able to recall three items
> immediately and two of three after a delay (4F/6). She was cooperative
> on exam (4F/6). Additionally, the claimant denied having any suicidal
> ideation (4F/6). As far as physical functioning, there was no evidence of
> any gait abnormality (7F/5, 33F/3, 75F/3, 10, 82F/3, 8). No swelling was
> noted in the claimant's extremities (75F/3, 10). She had normal lung
> exams as well (7F/4, 33F/2, 48F/15, 75F/10, 79F/4). Further, the claimant
> had normal cardiovascular exams (7F/4, 79F/1, 4). The claimant had
> normal musculoskeletal strength (7F/5, 48F/17). Her sensation was intact
> (7F/5, 48F/17). Extremity range of motion testing was within normal
> limits (7F/5). Straight leg raise testing was negative (7F/4). Finger-to-
> nose testing was performed without difficulty (48F/17). Regarding
> activities, the claimant reported being able to pay bills and count change
> (4E/5). She also reported being able to shop for groceries (4E/5). Further,
> she indicated that she was doing yoga and trying to walk (68F/7). As such,
> the overall evidence, including reported activities, is not consistent with
> the full extent of the opined limitations.

AR 25-26.

     The Court finds that the ALJ properly evaluated Dr. Pietruszka's opinion under the new

regulations.  First, the ALJ's reasoning regarding the overall evidence invokes the consistency factor,

17

which means the extent to which a medical opinion is "consistent ... with the evidence from other medical sources and nonmedical sources in the claim."  *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(c)(2)).

In contrast to Dr. Pietruszka's opined limitations, the ALJ noted that Plaintiff's symptoms showed improvement with treatment of her CIRS.  AR 2067 (noting treatments and that "patient has improved with treatment of her Chronic Inflammatory Response Syndrome, providing further evidence that it is the correct diagnosis.").  In terms of mental limitations, the ALJ noted that Plaintiff's attention span was within normal limits, her working memory, recall memory, and executive functioning were within normal limits; Plaintiff could perform digit-span testing forwards and backwards; Plaintiff's thought process was linear; Plaintiff could recall three items immediately and two items of three items after a delay; Plaintiff was cooperative on exam; and Plaintiff denied suicidal ideation.  AR 26; 659 (homicidal and suicidal ideation denied, memory findings noting recall of 3/3 "right away" and 2/3 "after 5 minutes," attitude was "cooperative," linear thought process, and attention span was "Within normal limits"); 997 ("Sustained Attention" and "Controlled Attention" in "expected range"; working memory, recall memory, and executive function in "expected range"); 2001 (for attention test, Plaintiff could repeat a list of digits in forward and backward order); 2110 (for attention test, Plaintiff could repeat a list of digits in forward and backward order).  The ALJ further noted that Plaintiff showed no evidence of gait abnormality and no swelling in extremities.  AR 26; 2333 ("No swelling in extremities" and "moving all four extremities, no focal deficits observed on gross examination"); 2340 ("No swelling in extremities" and "moving all four extremities, no focal deficits observed on gross examination"); 725 ("Gait: Within normal limits"); 1081 ("Gait and station are steady… Motor function is intact x4 extremities…"); 2399 ("Gait and station are steady… Motor function is intact x4 extremities…"); 2404 ("Normal gait").  The ALJ also noted normal findings for lung exams.  AR 26, 724 ("Lungs: Breath sounds are symmetric. There are no wheezes, rhonchi or rales. The expiratory phase is within normal limits."); 1080 ("Lungs: Grossly clear to auscultation. No wheezing or tachypnea. No cough of significance today."); 1285 ("Lungs: Clear to auscultation and percussion. No E to A changes or use of accessory muscles or inspiration. No fremitus."); 2340 ("Lungs: Equal air entry in both lung fields with no added breath sounds on auscultation, normal

respiratory effort"); 2364 ("LUNGS: Clear to auscultation. Anterior chest: There is discomfort to palpation in the very left upper chest aspect towards the left shoulder.").  The ALJ also noted that Plaintiff's cardiovascular findings, musculoskeletal strength findings, sensation findings, and extremity range of motion findings were normal or within normal limits.  AR 26; 724 (normal cardiovascular findings and normal back findings including note that "Straight leg raising is negative at 90 degrees."); 725 (findings for shoulders, elbows, wrists, hips, knees, ankles findings; "Motor strength was 5/5 in all extremities with good tone bilaterally with good active range of motion"); 1287 (Neurological Examination: "Finger-to-nose motion performed without difficulty;" and "Strength and sensation are intact"); 2361 ("CARDIOVASCULAR: Regular rate and rhythm without murmur or gallop"); 2364 ("CARDIOVASCULAR: Regular rate and rhythm without murmur, gallop, rub, heave, or click").  The ALJ's examination of the medical record therefore supported her discounting Dr. Pietruszka's opinion through the consistency factor.

Second, the ALJ found that Dr. Pietruszka's opined limitations, though based upon the record containing "voluminous treatment notes," were not fully consistent with the overall evidence.  AR 26. The ALJ's addressing of Dr. Pietruszka's treatment notes invokes the supportability factor, which means the "extent to which a medical source supports the medical opinion by explaining the 'relevant ... objective medical evidence.'"  *Woods*, 32 F.4th at 791-92. (citing 20 C.F.R. § 404.1520c(c)(1)). The ALJ's citation of the voluminous treatment notes suggests that there was greater supportability of Dr. Pietruszka's opinions.  While this suggests that the opinions were internally supported by Dr. Pietruszka's notes, the ALJ nevertheless addressed the important factor of supportability as part of her analysis.  The ALJ's analysis is therefore supported by the ALJ's examination of the supportability factor.

Third, the ALJ noted that Dr. Pietruszka's opinion was also inconsistent with Plaintiff's reported activities.  AR 26.  An ALJ may discount a physician's opinion when it is inconsistent with the claimant's reported activities.  *Morgan v. Comm'r*, 169 F.3d 595, 600-02 (9th Cir. 1999) (finding that the inconsistency between medical opinion and reported daily activities was a specific and legitimate reason for the ALJ to reject a treating physician's opinion).  In discussing Plaintiff's activities, the ALJ noted Plaintiff's daily activities, including being able to: pay bills, count change,

shop for groceries, do yoga, and attempt to walk.  AR 354 (Plaintiff noting that she goes outside six days a week and can: shop in stores for groceries one to two times every three weeks; pay bills, count change, handle a savings account, and use a checkbook and money orders; go out alone; and travel by walking or driving a car); 2090 ("The patient notes… She is doing yoga, walking").  The Court therefore finds the ALJ appropriately discounted Dr. Pietruszka's opinion given Plaintiff's relatively intact daily activities.

Plaintiff contends that the ALJ did not articulate how Plaintiff's activities were inconsistent with Dr. Pietruszka's opined limitations.  (Doc. 17 at 21-22.)  However, Plaintiff's allegations of disabling impairments contrast with Plaintiff's stated abilities, including that she goes outside six days a week, can go out alone, can do accounting tasks like paying bills, counting change, handling a savings account, and using a checkbook.  AR 354.  This allows the Court to discern the agency's path in utilizing Plaintiff's activities in discounting Dr. Pietruszka's opined limitations.  Accordingly, the ALJ did not err.  *See Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012) ("Even when an agency 'explains its decision with 'less than ideal clarity,'' we must uphold it 'if the agency's path may reasonably be discerned.'")

Plaintiff further contends that the ALJ did not appropriately address the consistency of Plaintiff's fatigue symptoms with the broader medical record, "as fatigue is not measured by any of the tests or findings cited by the ALJ."  (Doc. 17 at 21-22.)   However, the ALJ discussed Plaintiff's activities that weigh against Plaintiff's allegations of disabling fatigue.  AR 26; 354 (Plaintiff noting that she goes outside six days a week and can: shop in stores for groceries one to two times every three weeks; pay bills, count change, handle a savings account, and use a checkbook and money orders; go out alone; and travel by walking or driving a car)  While the ALJ did not expressly discuss fatigue in explaining why she discounted Dr. Pietruszka's opinion, the ALJ addressed findings from the medical record that suggest the fatigue was less than disabling, including an attention span within normal limits; working memory, recall memory, and executive function within normal limits; a linear thought process; normal musculoskeletal strength; and no evidence of gait abnormality.  AR 26.  Additionally, the ALJ did not rule out all limitations imposed by fatigue altogether but instead explained how she incorporated some degree of fatigue limitations into Plaintiff's RFC.  *See* AR 23-24 ("The overall

evidence, including the claimant's reported chronic fatigue, supports a limitation to the reduced range of the light exertional level, specifically that the claimant can lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and walk for about six hours and sit for about six hours in an eight-hour workday with normal breaks. Given her fatigue, functional complaints, and respiratory complaints, the claimant can never climb ladders, ropes or scaffolds, but occasionally climb ramps or stairs… Given her fatigue, she can have no exposure to unprotected heights and no use of moving hazardous machinery.")  The ALJ therefore did not err in not including a further discussion of Plaintiff's fatigue in discounting Dr. Pietruszka's opined limitations.

Plaintiff also contends that the ALJ should have interpreted the evidence as demonstrating that Plaintiff's capacity varied depending on her level of fatigue, citing the administrative record.  (Doc. 17 at 23.)  While Plaintiff puts forward her interpretation of the record, where "evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  *Woods*, 32 F.4th at 788 (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").  Plaintiff's alternate interpretation of the record therefore does not demonstrate that the ALJ erred.

Accordingly, the ALJ did not err in discounting Dr. Pietruszka's opinion.

2.  Opinions of Dr. Jim

Dr. Lysander Jim issued three sets of opined limitations.  First, on March 27, 2019, Dr. Jim completed a Physical Residual Function Capacity Medical Source Statement, in which he noted Plaintiff's diagnoses as "chronic inflammatory response syndrome, mast cell activation syndrome, chronic fatigue syndrome, restrictive lung disease" and listed the prognosis as "Guarded – likely permanent disability."  AR 1980.  Plaintiff's symptoms were listed as memory loss, brain fog, shortness of breath, palpitations, fatigue, numbness, and blurry vision, and Dr. Jim noted that Plaintiff's pain resulted from body aches and pains which varied from mild to severe and were worse with mold exposure, stress and other factors.  *Id.*  Dr. Jim listed Plaintiff's most significant clinical findings as severe memory loss, facial rash, and aches throughout body, and marked that Plaintiff's impairments, symptoms, and limitations lasted since the date Plaintiff claimed she could no longer

21

work. *Id.* Dr. Jim marked that Plaintiff could occasionally lift 20 pounds or more, could not walk one city block or more without rest or severe pain, could not walk one block or more on rough or uneven ground, and could not climb steps without use of a handrail at a reasonable pace. AR 1980-81. Dr. Jim marked that Plaintiff had problems with balance while ambulating and had problems with stooping, crouching, and bending. AR 1981. He marked that Plaintiff must lie down or recline for one to two hours before needing to sit up, stand up, or walk around due to fatigue, pain, stress, and "heart valve/leaky valve." *Id.* Dr. Jim marked that Plaintiff would need to lie down and/or recline approximately two to three hours during an eight-hour workday. *Id.* He also marked that Plaintiff could sit approximately two to three hours and stand and walk approximately two to four hours in an eight-hour workday. *Id.* Dr. Jim also noted that Plaintiff would need to take an unscheduled break every two to three hours, would have to rest two hours before returning to work, and would need to lie down or sit quietly during the breaks. AR 1981-82. He checked that Plaintiff did not need to elevate her legs during prolonged sitting, would not need a cane or other assistive device while walking, could do hand, finger, and arm manipulations "100%" of the time during an eight-hour workday, could not push and pull arm or leg controls from a sitting position for six or more hours per eight-hour workday, could climb stairs and ramps, and could not climb ladders or scaffolds or ropes. AR 1982. Dr. Jim checked that Plaintiff's pain would be severe enough to occasionally or frequently interfere with attention and concentration needed to perform simple work tasks, and Plaintiff's stress would be severe enough to frequently interfere with the attention and concentration needed to perform simple work tasks. *Id.* He marked that Plaintiff's limitations included memory lapses, need to avoid temperature extremes, dust, and fumes. *Id.* Dr. Jim marked that Plaintiff would be "off task" more than 30 percent of the time, would likely be absent from work five days or more per month, would likely be unable to complete an eight-hour workday for five days or more per month, and would be 50% or less efficient than an average worker in performing an eight hour per day, five day per week job on a sustained basis. AR 1983. He marked that Plaintiff would be unable to obtain and retain work in a competitive work environment eight hours per day, five days per week for a continuous period of six months or more. *Id.* He also checked that Plaintiff could manage benefit payments and

checked that he based his opinion upon the history and medical file; progress and office notes; physical examinations; laboratory tests and other tests; and x-rays, CT scans or MRIs.  *Id.*

Second, on August 5, 2020, Dr. Jim completed a mental residual functional capacity questionnaire.  AR 2010-13.  In this questionnaire, Dr. Jim marked that Plaintiff's impairments precluded performance for fifteen percent or more of an eight-hour workday as to: remembering locations and work-like procedures, understanding and remembering very short and simple instructions, understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods of time, performing activities within a schedule, maintaining regular attendance, being punctual and within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being distracted by them, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, being aware of normal hazards and taking appropriate precautions, and setting realistic goals or making plans independently of others.  AR 2011-12.  He also marked that Plaintiff's impairments precluded performance for ten percent or more of an eight-hour workday as to carrying out very short and simple instructions, traveling in unfamiliar places or using public transportation.  AR 2012.  He marked that Plaintiff's impairments precluded performance for five percent or more of an eight-hour workday as to maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, and responding appropriately to changes in the work setting.  *Id.*  He further marked that Plaintiff was not precluded as to: interacting appropriately with the general public, asking simple questions or requesting assistance, accepting instructions and responding appropriately to [critiques] from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  *Id.*  Dr. Jim marked that Plaintiff was likely to be absent from work or unable to complete an eight-hour workday due to her physical and/or mental impairments five days or more per month.  AR 2013.  He also wrote that Plaintiff had reduced intellectual functioning due to "impaired memory, executive function, focus, word-finding & learning ability," checked that Plaintiff could manage benefit payments, and checked that Plaintiff was not a malingerer.  *Id.*

Third, on August 5, 2020, Dr. Jim completed an additional Physical Residual Function Capacity Medical Source Statement.  AR 2014-17.  His August 5, 2020 opined limitations were substantially similar to the March 27, 2019 medical source statement, except that in the August 5, 2020 statement, Dr. Jim marked that Plaintiff: must lie down or recline for one to three hours before needing to sit up, stand up, or walk around; could sit approximately one to three hours; could stand and walk approximately one to three hours in an eight-hour workday; would need four unscheduled breaks in which Plaintiff would need to lie down or sit quietly for two hours before returning to work; must elevate her legs when sitting for a prolonged period; would occasionally, frequently, or constantly have pain severe enough to interfere with attention and concentration needed to perform simple work tasks; would constantly have stress severe enough to interfere with attention and concentration needed to perform simple work tasks; and had additional limitations including I.Q. limitations and the need to avoid wetness, humidity, and noise.  AR 2014-17.  Dr. Jim also marked that Plaintiff would be "off task" more than 30 percent of the time, would likely be absent from work five days or more per month, would likely be unable to complete an eight-hour workday for five days or more per month, and would be 50% or less efficient than an average worker in performing an eight hour per day, five day per week job on a sustained basis.  AR 2017.  He marked that Plaintiff would be unable to obtain and retain work in a competitive work environment eight hours per day, five days per week for a continuous period of six months or more.  *Id.*  He also checked that Plaintiff could manage benefit payments and marked that he based his opinion upon the history and medical file; progress and office notes; physical examinations; laboratory tests and other tests; psychological evaluations; and x-rays, CT scans or MRIs.  *Id.*

In evaluating Dr. Jim's opinion, the ALJ summarized Dr. Jim's findings and reasoned as follows:

> Lysander Jim, M.D., opined that the claimant could occasionally lift up to twenty pounds; must lie down for one to two hours at a time for up to three hours in an eight-hour day; sit for two to three hours; requires unscheduled breaks; would be absent for five days or more per month; and would be unable to complete an eight-hour workday five or more days per month (64F/17-20, 51-54). Dr. Jim also opined that the claimant's impairments precluded the performance of remembering work-like

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

procedures, completing a normal workday, making simple work-related decisions, and setting realistic goals for fifteen percent or more of the day (64F/47-50). This opinion is not found to be fully persuasive. While it is supported with treatment notes, the extent of the limitations is not fully consistent with the overall evidence and reported activities. The claimant's symptoms improved with treatment of her CIRS (65F/13). The record reveals her attention span was within normal limits (4F/6, 23F/60). The claimant's working memory, recall memory, and executive functioning were within normal limits (23F/60). She was able to perform digit-span testing forwards and backwards (64F/38, 68F/27). Her thought process was linear (4F/6). The claimant was able to recall three items immediately and two of three after a delay (4F/6). She was cooperative on exam (4F/6). Additionally, the claimant denied having any suicidal ideation (4F/6). As far as physical functioning, there was no evidence of any gait abnormality (7F/5, 33F/3, 75F/3, 10, 82F/3, 8). No swelling was noted in the claimant's extremities (75F/3, 10). She had normal lung exams as well (7F/4, 33F/2, 48F/15, 75F/10, 79F/4). Further, the claimant had normal cardiovascular exams (7F/4, 79F/1, 4). The claimant had normal musculoskeletal strength (7F/5, 48F/17). Her sensation was intact (7F/5, 48F/17). Extremity range of motion testing was within normal limits (7F/5). Straight leg raise testing was negative (7F/4). Finger-to-nose testing was performed without difficulty (48F/17). Regarding activities, the claimant reported being able to pay bills and count change (4E/5). She also reported being able to shop for groceries (4E/5). Further, she indicated that she was doing yoga and trying to walk (68F/7). As such, the overall evidence, including reported activities, is not entirely consistent with the full extent of the opined limitations.

17
18

AR 27-28.

19      The Court finds that the ALJ properly evaluated Dr. Jim's opinion under the new regulations.

20 First, the ALJ's reasoning regarding the overall evidence invokes the consistency factor, which means

21 the extent to which a medical opinion is "consistent ... with the evidence from other medical sources

22 and nonmedical sources in the claim." *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(c)(2)).

23 The ALJ noted that Plaintiff's symptoms showed improvement with treatment of her CIRS. AR 27;

24 2067.  In terms of mental limitations, the ALJ noted that Plaintiff's attention span was within normal

25 limits, her working memory, recall memory, and executive functioning were within normal limits;

26 Plaintiff could perform digit-span testing forwards and backwards; Plaintiff's thought process was

27 linear; Plaintiff could recall three items immediately and two items of three items after a delay;

28 Plaintiff was cooperative on exam; and Plaintiff denied suicidal ideation.  AR 27; 659; 997; 2001;

2110.  The ALJ further noted that Plaintiff showed no evidence of gait abnormality and no swelling in extremities.  AR 27; 2333; 2340; 725; 1081; 2399; 2404.  The ALJ also noted normal findings for lung exams.  AR 27, 724; 1080; 1285; 2340; 2364.  The ALJ found that Plaintiff's cardiovascular findings, musculoskeletal strength findings, sensation findings, and extremity range of motion findings were normal or within normal limits.  AR 27; 724; 725; 1287; 2361; 2364.  The ALJ's examination of the medical record therefore supported her discounting Dr. Jim's opinion through the consistency factor.

Second, the ALJ found that Dr. Jim's opined limitations, though "supported by treatment notes," were not fully consistent with the overall evidence.  AR 27.  The ALJ's addressing of Dr. Jim's treatment notes invokes the supportability factor, which means the "extent to which a medical source supports the medical opinion by explaining the 'relevant ... objective medical evidence.'"  *Woods*, 32 F.4th at 791-92. (citing 20 C.F.R. § 404.1520c(c)(1)).  The ALJ's citation of the treatment notes suggests that there was some degree of supportability of Dr. Jim's opinions.  While this suggests that the opinions were at least partially supported by Dr. Jim's notes, the ALJ nevertheless addressed the important factor of supportability as part of her analysis.  The ALJ's analysis is therefore supported by the ALJ's examination of the supportability factor.

Third, the ALJ noted that Dr. Jim's opinion was also inconsistent with Plaintiff's reported activities.  AR 28.  An ALJ may discount a physician's opinion when it is inconsistent with the claimant's reported activities.  *Morgan*, 169 F.3d at 600-02.  In discussing Plaintiff's activities, the ALJ noted Plaintiff's daily activities, including being able to: pay bills, count change, shop for groceries, do yoga, and attempt to walk.  AR 28; 354; 2090.  The Court therefore finds the ALJ appropriately discounted Dr. Jim's opinion given Plaintiff's relatively intact daily activities.

Plaintiff contends that the ALJ did not articulate how Plaintiff's activities were inconsistent with Dr. Jim's opined limitations.  (Doc. 17 at 22.)  However, Plaintiff's allegations of disabling impairments contrast with Plaintiff's stated abilities, including that she goes outside six days a week, can go out alone, can do accounting tasks like paying bills, counting change, handling a savings account, and using a checkbook.  AR 38; 354.  This allows the Court to discern the agency's path in utilizing Plaintiff's activities in discounting Dr. Jim's opined limitations.  Accordingly, the ALJ did not err.  *See Molina*, 674 F.3d at 1121.

1    Plaintiff further contends that the ALJ did not appropriately address the consistency of

2 Plaintiff's fatigue symptoms with the broader medical record, "as fatigue is not measured by any of

3 the tests or findings cited by the ALJ." (Doc. 17 at 22-23.)   However, the ALJ discussed Plaintiff's

4 activities that contrast with Plaintiff's allegations of disabling fatigue.  AR 28; 354.  While the ALJ

5 did not expressly discuss fatigue in explaining why she discounted Dr. Jim's opinion, the ALJ

6 addressed findings from the medical record that suggest the fatigue was less than disabling, including

7 an attention span within normal limits; working memory, recall memory, and executive function

8 within normal limits; a linear thought process; normal musculoskeletal strength; and no evidence of

9 gait abnormality.  AR 27.  Additionally, the ALJ did not rule out all limitations imposed by fatigue but

10 instead explained how she incorporated some degree of fatigue limitations into Plaintiff's RFC.  *See*

11 AR 23-24.  The ALJ therefore did not err in not including a further discussion of Plaintiff's fatigue in

12 discounting Dr. Jim's opined limitations.

13    Plaintiff also contends that the ALJ should have interpreted the evidence as demonstrating that

14 Plaintiff's capacity varied depending on her level of fatigue, citing the administrative record.  (Doc. 17

15 at 23.)  While Plaintiff puts forward her interpretation of the record, where "evidence is susceptible to

16 more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  *Woods*, 32 F.4th

17 at 788; *see also Tommasetti*, 533 F.3d at 1041.  Plaintiff's alternate interpretation of the record

18 therefore does not demonstrate that the ALJ erred.

19    Accordingly, the ALJ did not err in discounting Dr. Jim's opinion.

20    <u>**CONCLUSION AND ORDER**</u>

21    Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

22 evidence in the record as a whole and is based on proper legal standards.  Accordingly, IT IS

23 HEREBY RECOMMENDED as follows:

24    1.    Plaintiff's appeal from the administrative decision of the Commissioner of Social

25         Security be denied; and

26    2.    The Clerk of this Court be directed to enter judgment in favor of Defendant Martin

27         O'Malley, Commissioner of Social Security, and against Plaintiff Danae Schmitzer.

28

1    These Findings and Recommendations will be submitted to the United States District Judge

2    assigned to the case, as required by 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being

3    served with these findings and recommendations, the parties may file written objections with the

4    Court.  The document should be captioned "Objections to Magistrate Judge's Findings and

5    Recommendations."  The parties are advised that the failure to file objections within the specified time

6    may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal.

7    *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391,

8    1394 (9th Cir. 1991)).

9

10   IT IS SO ORDERED.

11       Dated:   __March 11, 2024__                    ____/s/ Barbara A. McAuliffe____

12                                                      UNITED STATES MAGISTRATE JUDGE

13

28